UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EMARIO ALLEN,

                                  Petitioner,

                                                          DECISION AND ORDER

-vs-

                                                          6:17-CV-6074 CJS

DALE A. ARTUS,

                                  Respondent.

_____

## INTRODUCTION

Petitioner Emario Allen ("Allen" or "Petitioner") brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his convictions after a jury trial, in New York State Supreme Court, Erie County, for Assault in the First Degree, Attempted Assault in the First Degree, and Robbery in the First Degree (2 counts), for which he was sentenced to determinate prison for terms of 25 years, 15 years, 25 years and 25 years, respectively, with the three 25-year sentences to run concurrently to each other but consecutively to the 15 year sentence, for a total sentence of 40 years.  The Petition asserts three claims: 1) "the trial court erroneously denied Petitioner's *Batson* objection"; 2) "denial of effective assistance of counsel"; and 3) "the trial court violated Petitioner's right to due process and to remain silent."  For the reasons explained below, the petition for a writ of habeas corpus is denied.

## BACKGROUND

The following is a summary of the relevant facts that a jury could have reasonably found from the evidence at trial.  During the early morning hours of November 12, 2011, Aaron Green ("Green") was celebrating his 25th birthday in nightclubs in the City of Buffalo.  Green began the evening with approximately $600 of cash in his possession, and throughout the evening he

purchased drinks for himself, friends and acquaintances.  At a nightclub called Buffalo Live, Green encountered Petitioner, who he had known since childhood.  Green offered to buy Petitioner a drink, but Petitioner declined.  At approximately 3:00 a.m., Green left that nightclub and drove with Frank Booker ("Booker") to another nightclub, Pandora's Sports Bar ("Pandora's").  At that time, Green still had approximately $300 in cash.

At approximately 3:15 a.m., Green and Booker parked their vehicles on Victoria Avenue and were walking toward Pandora's on the corner of Victoria and Fillmore Avenue when they were accosted in the middle of the street by Petitioner and two other individuals, Cordero Jones-Hicks ("Jones-Hicks") and Dwayne Gordon ("Gordon"), who had followed them after they left Buffalo Live.  Petitioner, Gordon and/or Jones-Hicks announced it was a robbery.  Petitioner, who was wearing a red hoodie sweatshirt and a baseball cap, then pulled a pistol from his waistband and fired at Booker, who turned and ran.  Petitioner then fired a bullet into each of Green's legs, fracturing both femurs.  As Green lay in the street, Petitioner, Gordon and/or Jones-Hicks beat and kicked him, then went through his pockets removing cash, keys and a phone.

Jones-Hicks or Gordon then commented that Petitioner needed to kill Green, since he knew Petitioner's name.  Petitioner pointed the pistol at Green's face, and Green, turning his face away and closing his eyes, believing that he was about to die, heard several clicks from the pistol, but no further gunshot.  Petitioner, Gordon and Jones-Hicks then drove off in a gray SUV.

Parts of the incident were witnessed by two residents of Victoria Avenue who called 911 after they were awakened by the gunshots.  Ulysees Wingo ("Wingo") told the 911 operator that the individual who pointed a gun at Green, and who appeared to fire twice, was wearing a red jacket or red sweatshirt and a baseball cap, while Daria Pratcher ("Pratcher"), who could not see the actual assault and robbery from her vantage point, indicated that three males, one of whom

was wearing red, ran past her home and fled from the scene in a gray SUV.  Booker, who had returned to the scene by the time the police arrived, also told officers that the shooter was wearing a red sweatshirt and a baseball cap.

Based on a description of the gray SUV that Pratcher provided to the 911 operator, Buffalo Police pulled over the SUV moments later.  Inside the vehicle were Petitioner, Gordon and Jones-Hicks.  Within a few minutes thereafter, police brought Petitioner back to the scene for a show-up, and Booker identified Petitioner as the shooter.

During booking, officers found that Jones-Hicks possessed $320 and a cell phone. Officers searched for a gun, both inside the SUV and along the route that the SUV had traveled from Victoria Avenue before being stopped, but found no firearm.[1]

Petitioner was questioned at the police station by two detectives, who administered *Miranda* warnings.  Petitioner waived his right to remain silent and indicated that he was surprised at being custody, since he had been asleep immediately prior to being arrested.  One of the detectives, Cedric Holloway ("Holloway"), then attempted, without success, to goad Petitioner into explaining what had really happened, by telling him that the police had many witnesses against him, and that he should admit his guilt to help his co-defendants, one of whom (Gordon) was on parole.  However, Petitioner remained silent in response to Holloway's statements.  The entire interview lasted approximately thirteen minutes.[2]

 On December 2, 2011, an Erie County Grand Jury returned a five-count Indictment (Indictment No. 02505-2011) against Petitioner, charging him with Attempted Murder in the First

---

[1] Although not part of the evidence at trial, the record indicates that shortly after Petitioner, Gordon and Jones-Hicks were arrested, Jones-Hicks told an officer that he had not been involved in the incident, but that he had been with Petitioner and Gordon, and had gotten separated from them.  Jones-Hicks stated that he then heard gunfire, after which Petitioner and Gordon rejoined him, and the three drove away.  Jones-Hicks indicated that either Gordon or Petitioner had thrown the gun out of the car window somewhere along the route that they had driven, and he returned to the area with officers to help them search, but no gun was found.
[2] Transcript at p. 528.

Degree, Assault in the First Degree, Attempted Assault in the First Degree and two counts of Robbery in the First Degree.  Petitioner was indicted along with Jones-Hicks and Gordon, though Petitioner was later granted severance.

Petitioner's attorney filed pretrial motions, including an application for a *Huntley* hearing. On April 2, 2012, the trial court conducted a *Huntley* hearing, and on July 11, 2012, the trial court ruled that Petitioner's statements to the detectives were admissible.

On July 16, 2012, jury selection began.  Toward the end of jury selection, the prosecutor exercised a peremptory challenge to an African American man, Leonard Lannie ("Lannie"). Lannie had indicated that he was 23 years of age, was a college student, worked part-time at a supermarket and resided with his parents.[3]  Lannie further indicated that he knew a prosecution witness, police officer Darren Exum ("Exum"), who was the officer who had pulled over the gray SUV in which Petitioner, Gordon and Jones-Hicks were riding.  The prosecutor asked Lannie how he knew Exum, and Lannie indicated that Exum was a friend of his sister.  When asked if his familiarity with Exum would affect his ability to be fair, Lannie answered, "No, I don't think so."[4]  When asked if he would evaluate Exum's credibility the same as any other witness, Lannie responded, "I think I could."  Later, the prosecutor asked Lannie again if his acquaintance with Exum was a problem for him, and Lannie answered, "No, it's not."  Similarly, the prosecutor asked whether Lannie would treat Exum fairly, and Lannie stated, "Yes."[5]

After the prosecutor exercised a peremptory challenge to Lannie, defense counsel raised a *Batson* objection.  In that regard, defense counsel stated that prior to that point, there had been several African-American potential jurors, two of whom the prosecution had already excused using peremptory challenges.  Defense counsel noted that other African-American potential

---

[3] Transcript at pp. 125-126.
[4] Transcript at p. 126.
[5] Transcript at p. 163.

4

jurors had also been excused, though not due to peremptory challenges by the prosecution.  In response to the *Batson* challenge, the prosecutor indicated that he had challenged Lannie for essentially two reasons:  First, because of Lannie's young age and perceived immaturity; and second, because Lannie knew Exum, who was going to be an important witness to the prosecution's case.  The prosecutor noted that he had also used peremptory challenges to excuse white jurors similar in age to Lannie, since he felt that they were also too young or immature to serve on a jury considering an A level felony.[6]  Further, the prosecutor indicated that he did not feel Lannie had been forthcoming about his feelings for Exum, stating: "And when I inquired of him whether he knew Officer Exum or whether that might be an issue for him, I wasn't satisfied that his answers were credible.  It just seemed incredible to me that he has no feelings whatsoever about Officer Exum one way or the other.  And given the fact that [Exum is] a key witness, for all of those reasons, we exercised a peremptory challenge."[7]

Defense counsel argued that the purported concern about Exum was pretextual, since Lannie had "answered the questions about his familiarity with [Exum] in all the detail that was requested of him," and had indicated that he could be fair and objective.[8]  Defense counsel further argued that the prosecutor was treating Lannie disparately, since the prosecutor had not excused Kara Wutz ("Wutz"), a white female juror who was only two years older than Lannie.

The prosecutor responded that Wutz was not similarly situated to Lannie, since she was older, was employed full-time and did not live with her parents.[9]  Further, with regard to Lannie's familiarity with Exum, the prosecutor reiterated that he felt uncomfortable with Lannie since he could not interpret Lannie's feelings for Exum "one way or the other":

---

[6] Transcript at pp. 189-190.
[7] Transcript at p. 191.
[8] Transcript at p. 192.
[9] Transcript at p. 193.

[W]ith respect to the relationship with Darren Exum, I just simply don't know what it is.  I don't know if it's positive or if it's negative.  It's most likely positive.  Usually it is.  He didn't indicate it was negative.  But he wouldn't say one way or the other, and that was the concern.  And that's the same reason we used on prospective juror Lisa Macaluso.  She knows not just cops, she knows a witness.  She knows Stu Easter.  And we exercised a challenge on her.  With respect to [Lannie], he doesn't just know cops, he knows a witness, a specific witness in this case.  That's the reasons we're challenging him.

And finally, Your Honor, with respect to Mr. Samuel [a black prospective juror against whom the prosecutor had previously exercised a peremptory challenge], I recognized he's a forty-six-year-old black man.  We challenged him for wholly different reasons.  Had nothing to do with his age.  Had everything to do with the answers to the questions he gave. And I know there was no *Batson* challenge at that time by Mr. Terranova, but to suggest, somehow piggyback to say that because we challenged Mr. Samuel, that it means we're exercising non-race-neutral purposes here, Your Honor, I just want to respond and say that's not the case.[10]

The trial court then denied the *Batson* challenge, stating:

I do have to find that, based on the District Attorney's explanations, that there are many race-neutral explanations for the challenge, and particularly knowing a witness per se pretty much would explain, no matter what the race of the prospective juror.  In most cases, I'm sure you would agree, Mr. Terranova, that that is a reason, as in the Stuart Easter example, so the *Batson* challenge is denied.

(Transcript at p. 195).  Defense counsel did not respond to the court's statement.

Turning to the testimony at trial, Green, the shooting victim, who was incarcerated at that time for a probation violation, initially indicated (outside the presence of the jury) that he did not want to testify, because Petitioner had confronted him the day before at the holding center where they were both housed.  Green then decided to testify, and stated that he and Petitioner knew each other.  Green, though, then testified in a manner inconsistent with his prior statements, and

---

[10] Transcript at pp. 194-195.

indicated that he did not see the person who had shot him, since it was "dark" and he was "drunk."[11]

It then became evident that the prosecutor was about to impeach Green with a prior written statement, at which time defense counsel asked to address the court outside of the presence of the jury.[12]    With the jury excused, defense counsel indicated that to the extent that the prosecution was going to impeach Green and/or ask to treat him as a hostile witness, Green's answers could subject him to criminal liability, which required the appointment of independent legal counsel to advise him.[13]    The prosecutor and the trial court agreed with defense counsel, and adjourned the trial for the day to allow Green to consult with an attorney.  The trial resumed the next day, and Green, having consulted an attorney, acknowledged on direct questioning by the prosecutor that he had not testified truthfully the day before when he said he did not see who had shot him.  In that regard, Green indicated that he had testified falsely since he did not want to be labeled a snitch, and because he had been fearful that "something might happen to [him]."[14] Green stated that he had seen Petitioner in the jail law library, and Petitioner had told him, "Just basically, don't come to court."[15]   Green further testified that earlier that week, when he and Petitioner and other inmates were in the court's holding cells, Petitioner had pointed him out to other inmates, after which an inmate whom Green did not know attacked him and punched him in the face.

After explaining his inconsistent testimony the previous day, Green testified that after he and his companions parked their cars on Victoria and began walking towards Pandora's, he saw Petitioner, who was wearing a "red hoodie," coming toward him with a gun in his hand.  Green

---

[11] Transcript at p. 355.
[12] Transcript at p. 355-356.
[13] Transcript at p. 357.
[14] Transcript at p. 362.
[15] Transcript at p. 363.

stated that Petitioner then shot him once in each leg, whereupon he fell in the street and then felt an individual, not Petitioner, going through his pockets and taking his money, phone and keys.  Green testified that one of the persons with Petitioner then stated that Petitioner needed to kill Green, since Green knew Petitioner, whereupon Petitioner pointed the gun at Green's face.  Green indicated that he closed his eyes, thinking that he was about to die, and heard four "clicks," after which Petitioner and those with him ran off.

Wingo, who lived in the house in front of which Green was shot,  testified at trial that on the morning of the crime he was awakened by the sound of multiple gunshots, and looked out his window where he saw "three gentlemen beating, kicking a guy laying in the street."[16]  He saw one of three attackers hand a pistol to another of the attackers who was wearing a red jacket and a baseball cap.  Wingo stated that after the attackers took the victim's property, the individual in the red jacket and baseball cap "shot [the victim] a couple more times and then they ran."[17]  In that regard, Wingo stated that it appeared that the individual in red had fired two shots at the person laying in the street, since the victim's body had moved as if  he had been hit.  Wingo indicated, though, that he could not say whether the victim had actually been hit with gunfire.[18]

Pratcher, who lived a few houses away from Wingo on Victoria Avenue, indicated that on the morning of the crime she was awakened by gunfire and called 911.  Pratcher stated that while she was on the phone with the 911 operator, three males, one of whom was wearing red, ran by her home and drove away in a gray SUV.

Holloway, one of the detectives who had interviewed Petitioner, also testified.   In conjunction with Holloway's testimony, the prosecutor played the audio tape of the 13-minute interrogation that had occurred on the morning of the shooting.  The trial court permitted the

---

[16] Transcript at p. 419.
[17] Transcript at p. 421.
[18] Transcript at p. 430.

prosecutor to play the recording in its entirety, over the defense's objection.  Regarding the objection, Defense counsel indicated that while, following the *Huntley* hearing, the court had ruled that Petitioner's statements were admissible, he had not anticipated that the court would admit the entire recording.  Defense counsel argued that it was unfair to play the entire recording, since the detective's statements to Petitioner suggested that there were many witnesses against Petitioner.  Defense counsel further argued that by repeatedly urging Petitioner to speak, the detectives had improperly "shifted the burden" onto Petitioner to explain his silence.

The trial court overruled the objection, observing that defense counsel would have the opportunity to cross-examine Holloway, who had made the recording and who was then testifying.  After the audio tape was finished playing, defense counsel made a motion for a mistrial, again arguing that the questioning by the detectives was highly prejudicial to Petitioner, since the detectives' questions shifted the burden of proof onto Petitioner to explain himself, in violation of his right to remain silent.  The prosecutor responded, in part, by arguing that there was no burden shifting, and no improper conduct since Petitioner had agreed to waive his *Miranda* rights and make a statement:

> The question about his commenting or shifting the burden is absurd, Your Honor. There is no burden shifting here.  The defendant chose to speak.  He did not choose to remain silent.  When early on in this interview he was asked about his involvement, he said, I was asleep, I'm surprised I'm here.  That's what prompted the follow-up questions [by Holloway] and the long delays of silence by this defendant.  And the case law is also clear that once a defendant chooses to speak, not only can we play or acknowledge his silence thereafter, we can comment on it if we want in summation or any point in the trial because he chose to speak, he chose to say something, and what he said is incompatible with what the evidence shows.

Transcript at p. 536.  The court denied the application for a mistrial.

During summations, defense counsel revisited the recorded interview and spent some time arguing that Detective Holloway had acted "illegally" during the interview by attempting to shift the burden onto Petitioner to explain himself.[19]  Defense counsel further told the jury that it would be "illegal" for them to consider the "long stretches of silence" during the interview as some evidence of guilt.[20]   In response to this, during the prosecutor's summation, he emphasized to the jury that the recorded interview was significant not because of Petitioner's silence but because of what Petitioner said, which was inconsistent with the rest of the evidence:

> Defense counsel wants to make a big deal about all the silence and all the other things you heard when you heard the entire interview.  It's not burden shifting.  I wanted you to hear what the defendant had to say.  And what – everything Cedric Holloway did was absolutely not illegal.  He's investigating an attempted murder.  It's not nice, and it's not his job to be nice to this defendant.  I wanted you to hear that statement [(Petitioner's statement that he had been asleep and was surprised to find himself at the police station)] because it's completely untrue.   He was observed running – this defendant was observed running to that gray Trailblazer.  He was observed running in that direction by Ulysees Wingo, he was observed by Daria Pratcher getting in that vehicle and he was caught fleeing the scene in the same vehicle by Darren Exum.  He was not sleeping.  You can't be running and sleeping at the same time.

Transcript at p. 670.

Following the summations of counsel, the court instructed the jury, *inter alia*, that it could not draw any negative inference from Petitioner's silence, and that the detectives' questions to Petitioner were not evidence.[21]

On July 24, 2012, the jury returned with a partial verdict.  The jury could not reach a unanimous verdict on Count I of the Indictment, charging Attempted Murder, but it found

---

[19] Transcript at pp. 650-652.
[20] Transcript at p. 651 ("What a big mistake it would be, and how illegal it would be, for you to consider those long stretches of silence as . . . requiring my client to explain himself[.]").
[21] Transcript at pp. 691, 693-4.

Petitioner guilty on Counts II-V.  The court granted a mistrial as to Count I, and later dismissed that count of the Indictment.

On August 28, 2012, the trial court sentenced Petitioner, as noted earlier, on Counts 2-5 of the Indictment, to determinate prison for terms of 25 years, 15 years, 25 years and 25 years, respectively, with the three 25-year sentences to run concurrently to each other but consecutively to the 15-year sentence, for a total sentence of 40 years.

Petitioner appealed his convictions, asserting the following grounds: 1) the conviction for Attempted Assault in the First Degree was against the weight of the evidence; 2) the trial court erroneously denied the motion for a mistrial based on admission of the taped statement of Petitioner's questioning "which featured the officer's badgering of [Petitioner] and ridiculing his silence," and trial counsel was ineffective for failing to raise the interrogating detective's "bullying manner of interrogation and the comments of the detective [about Petitioner's] silence"; 3) Petitioner was denied equal protection under the constitutions of the United States and the State of New York  when the court allowed the prosecutor to use a peremptory challenged to remove a prospective juror without giving a non-pretextual race-neutral reason; 4) the court erred in finding that a jailhouse informant was not an agent of the prosecution; 5) the court failed to properly instruct the jury concerning the verdict sheet; 6) the court failed to rule on all parts of Petitioner's motion to dismiss the indictment; and 7) the sentences should be concurrent and are harsh and excessive.

On November 21, 2014, the Fourth Department unanimously denied Petitioner's appeal and affirmed his convictions and sentence.

On December 17, 2014, Petitioner sought leave to appeal from the New York Court of Appeals primarily on two issues: 1) the Fourth Department erred in denying the equal protection/*Batson* challenge; and 2) trial counsel was ineffective in making his *Batson* challenge,

because he "failed to note that a similarly situated white juror [(Carol Schiferle ("Schiferle"))] who knew a police witness was allowed on the jury by the prosecutor." The second of these arguments was not raised by Petitioner before the Appellate Division. In addition to those arguments, Petitioner included a blanket statement asking the Court of Appeals to a review every other issue in his brief to the Fourth Department.[22]

On April 7, 2015, the Court of Appeals denied leave to appeal.

Petitioner moved for reconsideration, but on July 14, 2015, the Court of Appeals denied the application for reconsideration.

On July 22, 2016, Petitioner filed a motion for writ of error coram nobis with the Fourth Department, alleging ineffective assistance of appellate counsel. In particular, Petitioner argued that his appellate attorney had failed to raise issues of ineffective assistance by trial counsel, even though Petitioner had asked him to do so. In the coram nobis motion, Petitioner alleged that trial counsel had provided ineffective assistance in the following ways: 1) with respect to the charge of Attempted Assault in the First Degree, he never discussed with Petitioner "the possibility of requesting a charge down to the lesser included offense of Attempted Assault in the Third Degree"; 2) he erred, during the prosecution's examination of Green, by asking the trial court to declare Green a hostile witness and appoint him counsel, and by failing to object to aspects of Green's testimony.

---

[22] *See, Jordan v. Lefevre*, 206 F.3d 196, 198 (2d Cir. 2000) ("In this case, Jordan forcefully argued his *Batson* claim in the first three paragraphs of his application for leave, but made no reference to his other claims. In the fourth paragraph of his counsel's letter to the New York Court of Appeals he asked that he be given permission to appeal "[f]or all of these reasons and the reasons set forth in his Appellate Division briefs." Arguing a single claim at length and making only passing reference to possible other claims to be found in the attached briefs does not fairly apprise the state court of those remaining claims.").

On September 30, 2016, the Fourth Department denied the motion for writ of error coram nobis.

On November 10, 2016, Petitioner sought leave to appeal to the Court of Appeals. However, on January 23, 2017, the Court of Appeals denied that application.

On January 31, 2017, Petitioner filed the subject habeas petition, proceeding *pro se.* As indicated above, the Petition purports to set forth three separate grounds for relief: 1) "the trial court erroneously denied the defense's *Batson* objection"; 2) "denial of effective assistance of counsel"; and 3) "the trial court violated Petitioner's right to due process and to remain silent." With regard to Claim 1, Petitioner alleges that the trial court erred in denying his *Batson* challenge where the Prosecutor used a peremptory challenge to excuse an African-American juror, while leaving two other jurors (Wutz and Schiferle) who were similarly situated except that they were white. With regard to Claim 2, Petitioner alleges that his trial defense attorney was ineffective in the following respects: At the *Huntley* hearing he "failed to raise the bullying manner of interrogation and comments by detective Cedric Holloway; he failed to ask for a jury charge on the voluntariness of Petitioner's statement to police; he failed, when making his *Batson* challenge, to argue that Petitioner was being treating differently than a similarly-situated white juror; he erred in requesting that prosecution witness Aaron Green be declared a hostile witness, "which led the prosecution to elicit inadmissible and highly prejudicial testimony"; and he "never discussed with Petitioner the possibility of requesting a charge down to the lesser included offense of Attempted Assault in the Third Degree given the weak and insubstantial evidence on Count Three of [the Indictment charging] Attempted Assault in the First Degree." As for Claim 3, Petitioner alleges that the trial court erred, since

> [t]he tape of the statement by Petitioner taken by Detective Holloway was admitted into evidence at trial [and] was played in its entirety at trial over defense counsel's objection in an unredacted state[ment]. The Prosecution placed a portion of the

taped statement to the jury during summation despite the detectives ridiculing and mocking of Petitioner's silence to cajole Petitioner to break that silence and answer his questions and shifting the burden to Petitioner to explain himself.

Petition, ECF No. 1 at p. 21.

On June 16, 2017, Respondent filed an Answer and Memorandum of Law. (ECF Nos. 5, 6).  Respondent contends that the Petition is untimely;  that the trial court did not err in denying the *Batson* challenge since the Prosecutor provided two "permissible, race-neutral reasons for his peremptory challenge of an African-American juror, and Petitioner failed to establish that the explanation was a pretext for discrimination"; that the alleged instances of ineffective assistance of counsel are unexhausted except for one – counsel's failure to challenge the voluntariness of Petitioner's statement – and as to that claim counsel was not ineffective; and the trial court's admission of the audiotape of Petitioner's interrogation, in which a detective made "comments critical of Petitioner's silence," did not violate Petitioner's right to remain silent, since Petitioner waived his *Miranda* rights and agreed to speak with police, since the admission of the tape was not fundamentally unfair, and since the trial court gave "a limiting instruction to curtail any possible prejudice."

On July 17, 2017, Petitioner field a Traverse/Reply. (ECF No. 8) in which he asserts that Respondent's arguments are "baseless."  In particular, Petitioner contends that Respondent's argument that the Petition is untimely is incorrect, based on the timing of Petitioner's request for reconsideration that he filed with the New York Court of Appeals.

The Court has considered the parties' submissions and the entire record.  Pursuant to Rule 8 of Rules Governing Habeas Corpus cases under Section 2254 in the United States District Courts and upon review of the answer, transcript and record, the Court determines that

an evidentiary hearing is not required. After considering the parties' submissions and the entire record, the petition is denied for the reasons set forth below.

DISCUSSION

Petitioner's *Pro Se* Status

Since Petitioner is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

Section 2254 Principles

Petitioner brings this habeas corpus petition pursuant to 28 U.S.C. § 2254, and the general legal principles applicable to such a claim are well settled.

> As amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and interpreted by the Supreme Court, 28 U.S.C. § 2254—the statutory provision authorizing federal courts to provide habeas corpus relief to prisoners in state custody—is "part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011). A number of requirements and doctrines . . . ensure the centrality of the state courts in this arena. First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance. *See id.* (citing 28 U.S.C. § 2254(b)). Should the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions. *See generally Wainwright v. Sykes*, 433 U.S. 72, 82–84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). If the state court denies a federal claim on the merits, then the provisions of § 2254(d) come into play and prohibit federal habeas relief unless the state court's decision was either: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1)-(2). Finally, when conducting its review under § 2254(d), the federal court is generally confined to the record before the state court that adjudicated the claim. *See Cullen v. Pinholster*, —— U.S. ——, 131 S.Ct. 1388, 1398–99, 179 L.Ed.2d 557 (2011).

*Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014).  As just mentioned, regarding claims that were decided on the merits by state courts,

> a federal court may grant habeas corpus relief to a state prisoner on a claim that was adjudicated on the merits in state court only if it concludes that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).
>
> A state court decision is contrary to clearly established Federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's result.
>
> A state court decision involves an unreasonable application of clearly established Federal law when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case.  To meet that standard, the state court's decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.  It is well established in this circuit that the objectively unreasonable standard of § 2254(d)(1) means that a petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.

*Santana v. Capra*, No. 15-CV-1818 (JGK), 2018 WL 369773, at *7–8 (S.D.N.Y. Jan. 11, 2018) (Koeltl, J.) (citations and internal quotation marks omitted).

<u>The Timeliness of the Petition</u>

Respondent contends that the Petition is untimely, and the legal principles generally applicable to this issue are well settled:

> Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas petitions must be filed within one year of the date on which the petitioner's state judgment became final. 28 U.S.C. § 2244(d)(1). A judgment becomes final "after the denial of certiorari [by the U.S. Supreme Court] or the expiration of time for seeking certiorari." *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).

Consequently, state judgments are deemed final if no petition for a writ of certiorari has been filed with the Supreme Court within 90 days. *See Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir. 1998); Sup. Ct. R. 13.

The filing of certain state court collateral attacks on a judgment, including New York *coram nobis* petitions, tolls AEDPA's one-year statute of limitations. 28 U.S.C. § 2244(d)(2); *see Smith v. McGinnis*, 208 F.3d 13, 15–16 (2d Cir. 2000). "[P]roper calculation of § 2244(d)(2)'s tolling provision excludes time during which properly filed state relief applications are pending but does not reset the date from which the one-year statute of limitations begins to run." *Smith*, 208 F.3d at 16 (emphases added). In "rare and exceptional" circumstances, AEDPA's one-year statute of limitations can be equitably tolled to permit the filing of an otherwise time-barred petition. *Id.* at 17 (citation omitted). Courts must decide whether equitable tolling is applicable on a "case-by-case basis," while still being "governed by rules and precedents" and "draw[ing] upon decisions made in other similar cases for guidance." *Holland v. Florida*, 560 U.S. 631, 649–50, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) (citations omitted). To invoke the doctrine of equitable tolling, a petitioner bears the burden of establishing two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005).

*Davis v. Lempke*, 767 F. App'x 151, 152–53 (2d Cir. 2019).

Here, as discussed earlier, with regard to Petitioner's direct appeal, the New York Court of Appeals denied his application for leave to appeal on April 7, 2015, and then denied his motion for reconsideration on July 14, 2015.  In arguing that the Petition is untimely, Respondent does not mention the request for reconsideration.  Rather, Respondent states: "In petitioner's case, leave to appeal was denied on April 27, 2015, meaning that the conviction became final on July 26, 2015 (90 days later)."[23] (Respondent inaccurately uses the date of April 27, 2015, when the actual date of the initial denial by the Court of Appeals was April 7, 2015).  Consequently, a preliminary issue is what effect, if any, did Petitioner's request for reconsideration have on the date that his conviction became "final" for purposes of 28 U.S.C. § 2244(d)(1)(A)?

---

[23] ECF No. 6 at p. 8.

As this Court has previously held, the conviction becomes final ninety days after the Court of Appeals denies a motion for reconsideration. *Brockway v. Burge*, 710 F. Supp. 2d 314, 321–22 (W.D.N.Y. 2010) ("As respondent points out, the Appellate Division affirmed the judgment of conviction on November 13, 1998, and the New York Court of Appeals denied Brockway's application for reconsideration on June 22, 1999. Petitioner's conviction became "final" ninety (90) days later, on September 20, 1999, the date on which his time to seek a writ of certiorari from the United States Supreme Court expired."); *see also, Hizbullahankhamon v. Walker*, 255 F.3d 65, 68 (2d Cir. 2001) ("On direct appeal, the Appellate Division, First Department, unanimously affirmed the conviction, *People v. Johnson*, 181 A.D.2d 509, 580 N.Y.S.2d 357 (1st Dep't 1992). The Court of Appeals denied petitioner's application for leave to appeal, *People v. Johnson*, 80 N.Y.2d 833, 587 N.Y.S.2d 917, 600 N.E.2d 644 (1992), *and, on December 10, 1992, denied his application for reconsideration*, *People v. Johnson*, 81 N.Y.2d 763, 594 N.Y.S.2d 725, 610 N.E.2d 398 (1992). Petitioner's conviction thus became final on March 10, 1993, the date on which the time to petition for certiorari to the Supreme Court of the United States expired. *See Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir.1998).") (emphasis added).

Consequently, Petitioner's conviction became "final" on October 12, 2015, which was ninety days after the Court of Appeals denied his application for reconsideration. Petitioner then had one year in which to file an application under 28 U.S.C. § 2254.

The 1-year clock then ran for more than nine months, from October 13, 2015, until July 22, 2016, when Petitioner filed his motion for writ of error coram nobis, at which point the clock was tolled pursuant to § 2244(d)(2). The clock remained tolled until January 23, 2017, when the New York Court of Appeals denied Petitioner's request for leave to appeal the Fourth Department's denial of his coram nobis application. At that time, Petitioner still had more than two months remaining on his 1-year clock. On January 31, 2017, eight days after the Court of

Appeals denied his application for leave to appeal, Petitioner filed this action.  Accordingly, the action is timely as it was filed within one year after Petitioner's conviction became final.

Respondent disagrees and contends that the clock was tolled only until September 30, 2016, when the Appellate Division denied the motion for writ of error coram nobis.  On that point, Respondent asserts that, "[t]he limitation period was not tolled . . . during the interval between the denial of the motion and the denial of petitioner's application [to the Court of Appeals] for leave to appeal. *Hizbullahankhamon v Walker*, 255 F3d 65, 71-72(2nd Cir 2001), cert   536 US 925."  However, Respondent's reliance on *Hizbullahankhamon* is misplaced, since at the time that decision was issued, a defendant had no right under New York law to apply to the Court of Appeals for leave to appeal from a denial of a coram nobis motion. *Id.*, 255 F.3d at 69-72.  New York State law was subsequently amended, and now defendants are permitted to seek such relief from the Court of Appeals.[24]  Consequently, Petitioner's coram nobis motion remained pending, within the meaning of § 2244(d)(2), until January 23, 2017.

---

[24] *See, McPherson v. Greiner*, No. 02 CIV.2726 DLC AJP, 2003 WL 22405449, at *12 (S.D.N.Y. Oct. 22, 2003) ("In 2002, the New York Criminal Procedure Law was amended to allow permissive appeals to the New York Court of Appeals from the denial of coram nobis petitions. C.P.L. § 450.90(1)."); *see also, Witherspoon v. New York*, No. 11-CV-5815 DLI, 2015 WL 5676020, at *2 (E.D.N.Y. Sept. 24, 2015) ("In *Hizbullahankhamon v. Walker*, the Second Circuit held that "the one-year limitations period was not tolled during the intervals between [the coram nobis] denials [by the Appellate Division] and the dates on which the Court of Appeals dismissed Petitioner's applications for leave to appeal these denials" because New York law did not authorize appeals from coram nobis denials. 255 F.3d 65, 70–71 (2d Cir.2001).  However, in 2002, New York law changed to allow the Court of Appeals to consider requests for leave to appeal coram nobis denials. N .Y. C.P.L. § 450.90(1); *see also People v. Stultz*, 2 N.Y.3d 277, 281, 778 N.Y.S.2d 431, 810 N.E.2d 883 (2004) (recognizing that New York State law "authoriz[es] appeals (by permission) to this Court from appellate orders granting or denying coram nobis relief based on claims of ineffective assistance or wrongful deprivation").  Subsequently, the Second Circuit held that "a § 440.10 motion is 'pending' for purposes of AEDPA at least from the time it is filed through the time in which the Petitioner could file an application for a certificate for leave to appeal the Appellate Division's denial of the motion." *Saunders v. Senkowski*, 587 F.3d 543, 548 (2d Cir.2009).  Although the Second Circuit has yet to address whether the limitation period is tolled during the 30–day period in which the denial of a coram nobis petition is appealable, the reasoning of Saunders suggests that AEDPA's one-year limitation period is tolled during this period."); *Mohsin v. Ebert*, 626 F. Supp. 2d 280, 294 (E.D.N.Y. 2009) ("Mohsin filed his Coram Nobis Motion on September 1, 2004, tolling the statute of limitations 321 days after his conviction became final. The court denied the Coram Nobis Motion on March 21, 2005. Under earlier case law, that event would have ended the tolling period for purposes of the one-year statute of limitations, on the ground that the denial of such a motion is not appealable. See, e.g., *Hizbullahankhamon v. Walker*, 255 F.3d 65, 70–71 (2d Cir.2001) (citing cases). However, a change in New York law permitted Mohsin to seek leave to appeal the denial of his Coram Nobis Motion. *See* N.Y.Crim. Pro. Law 450.90(1) (2002). As a result, the denial of the Coram Nobis Motion became final

For these reasons, Petitioner's contention that the petition is untimely lacks merit.   The Court finds, instead, that the petition was timely filed.

Unexhausted and Procedurally Defaulted Claims

Respondent next contends that all but one of the instances of alleged ineffective assistance of trial counsel, set forth Petitioner's "Ground Two," are unexhausted and procedurally defaulted since Petitioner failed to raise them in his direct appeal.   The applicable legal principles are clear:

> If anything is settled in habeas corpus jurisprudence, it is that a federal court may not grant the habeas petition of a state prisoner "unless it appears that the applicant has exhausted the remedies available in the courts of the State; or that there is either an absence of available State corrective process; or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b)(1). To satisfy § 2254's exhaustion requirement, a petitioner must present the substance of "the same federal constitutional claim[s] that he now urges upon the federal courts," *Turner v. Artuz*, 262 F.3d 118, 123-24 (2d Cir.2001), "to the highest court in the pertinent state," *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir.1990).
>
> When a claim has never been presented to a state court, a federal court may theoretically find that there is an "absence of available State corrective process" under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile. In such a case the habeas court theoretically has the power to deem the claim exhausted. *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997). This apparent salve, however, proves to be cold comfort to most petitioners because it has been held that when "the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," federal habeas courts also must deem the claims procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).
>
> ***
>
> Dismissal for a procedural default is regarded as a disposition of the habeas claim on the merits.  .  .  .   For a procedurally defaulted claim to escape this fate, the petitioner must show cause for the default and prejudice, or demonstrate that

no earlier than August 8, 2005, when the Court of Appeals denied Mohsin leave to appeal.").

failure to consider the claim will result in a miscarriage of justice (*i.e.*, the petitioner is actually innocent). *Coleman*, 501 U.S. at 748-50, 111 S.Ct. 2546 (1991).

*Aparicio v. Artuz*, 269 F.3d 78, 89–90 (2d Cir. 2001).

Here, in "Ground Two," as mentioned earlier Petitioner alleges that his trial defense attorney was ineffective in the following five instances: 1) At the *Huntley* hearing he "failed to raise  the bullying manner of interrogation and comments by detective Cedric Holloway; 2) he failed to ask for a jury charge on the voluntariness of Petitioner's statement to police;  3) he failed, when making his *Batson* challenge, to argue that Petitioner was being treating differently than a white juror, Carol Schiferle, who also knew a police witness; 4) he erred in requesting that prosecution witness Aaron Green be declared a hostile witness, "which led the prosecution to elicit inadmissible and highly prejudicial testimony"; and 5) he "never discussed with Petitioner the possibility of requesting a charge down to the lesser included offense of Attempted Assault in the Third Degree given the weak and insubstantial evidence on Count Three of [the Indictment charging] Attempted Assault in the First Degree."

Respondent contends that only the first of these, number 1) above, was properly exhausted, while the remaining four are unexhausted and procedurally defaulted.  The Court agrees.

Number 1) was exhausted because Petitioner raised it both in his direct appeal brief to the Appellate Division, and in his application for leave to appeal to the Court of Appeals.   On the other hand, number 2) was *not* exhausted, since it was never raised in the state courts.

Number 3) was raised in the state courts, but only in Petitioner's application for leave to appeal to the Court of Appeals, following the denial of his appeal by the Appellate Division. Petitioner did not raise that claim before the Appellate Division.  Consequently, the claim is unexhausted, since "raising a federal claim for the first time in an application for discretionary

review to a state's highest court is insufficient for exhaustion purposes." *St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004); *see also, Clark v. Dolce*, No. 9:11-CV-00893-JKS, 2014 WL 2573119, at *4 (N.D.N.Y. June 9, 2014) ("Clark's challenge to the imposition of consecutive sentences is also unexhausted. He raised this claim for the first time in his application for leave to appeal to the Court of Appeals. Because he raised this claim only in a discretionary leave application, it is unexhausted.") (citing *St. Helen v. Senkowski*).

Numbers 4) and 5) were raised in the state courts, but only indirectly, in the coram nobis application.  That is, in the coram nobis motion, Petitioner alleged that *appellate* counsel had been ineffective for failing to raise the instances of alleged ineffectiveness by trial counsel described in numbers 4) and 5).

Courts in this circuit routinely hold that raising an ineffective-assistance-of-appellate-counsel claim in a coram nobis motion does not exhaust the underlying claims that appellant counsel failed to raise. *See, e.g., Roberts v. Lamanna*, No. 19 CV 880 (AMD)(LB), 2020 WL 5633871, at *6 (E.D.N.Y. Aug. 31, 2020) (""[C]ourts in this circuit have consistently recognized[ ] an ineffective assistance claim is an insufficient vehicle for exhausting the underlying allegations when those allegations are asserted for the first time as separate claims on habeas." *Hall v. Phillips*, No. 04 CV 1514 (NGG)(VVP), 2007 WL 2156656, at *5 (E.D.N.Y. July 25, 2007) (citing cases)."), report and recommendation adopted, No. 19CV00880AMDLB, 2020 WL 5633078 (E.D.N.Y. Sept. 21, 2020); *see also, Cobb v. Unger*, No. 09-CV-0491MAT, 2013 WL 821179, at *3 (W.D.N.Y. Mar. 5, 2013) ("Under New York law, a writ of error coram nobis is available "only to vacate an order determining an appeal on the ground that the defendant was deprived of the effective assistance of appellate counsel," and other constitutional errors may only be advanced in coram nobis applications to the extent that they are "predicates for the claim of ineffectiveness, on the theory that effective counsel would have appealed on those grounds."

*Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir.2001) (internal quotation marks omitted). *In other words, no claim besides ineffective assistance of appellate counsel can be exhausted through an application for a writ of error coram nobis.* Thus, Petitioner has exhausted his ineffective assistance of appellate counsel claim by virtue of his coram nobis application, the denial of which he appealed to the state's highest court. See 28 U.S.C. § 2254(b). *However, none of the underlying claims in the habeas petition were exhausted by this procedure, and thus they remain unexhausted for purposes of federal habeas review.*") (emphasis added).

However, in *Aparicio v. Artuz*, cited earlier, the Second Circuit ruled that a habeas petitioner had exhausted a claim for ineffective assistance of trial counsel that was asserted in a coram nobis petition, along with a claim for ineffective assistance of appellate counsel, stating:

> Petitioner did raise, in his coram nobis petition to the Appellate Division, the ineffectiveness of his trial counsel for failing to request an eyewitness identification instruction. See supra, at 86 & n. 1. However, the Appellate Division did not explicitly address this claim, writing only, "appellant has failed to establish that he was denied effective assistance of appellate counsel." *Aparicio*, 696 N.Y.S.2d at 697. Although the trial counsel claim was not explicitly addressed, it was, as a technical matter, adjudicated; the Appellate Division denied Aparicio's coram nobis application. *Id.* Thus, this claim is exhausted. *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

*Id.*, 269 F.3d at 92. The foregoing quote suggests that, unlike in the instant case, the petitioner in *Aparicio* raised the alleged ineffectiveness of trial counsel as a stand-alone claim in his coram nobis motion, in addition to the alleged ineffectiveness of appellate counsel, rather than merely identifying it as a claim that appellate counsel should have raised. The Circuit Court went on to find, though, that the ineffective-assistance-of-trial-counsel claim was nevertheless procedurally barred, reasoning that the Appellate Division necessarily had to have denied the claim on state procedural grounds, insofar as the defendant had no excuse for failing to raise it in his direct appeal. *Id.*, 269 F.3d at 93 ("The Appellate Division's conclusion on coram nobis that Aparicio

was not denied effective assistance of appellate counsel disposed of Aparicio's only proffered cause for the failure to raise the trial counsel claim on direct appeal. The Appellate Division's decision concerning Aparicio's trial counsel claim thus had to rest on a state procedural bar; under New York law, the decision could not possibly rest on any other ground.").

Subsequently, some district courts have interpreted *Aparicio* to find that "underlying" ineffective-assistance-of-trial-counsel claims in coram nobis motions are exhausted but nevertheless procedurally barred. *See, e.g., Davis v. Greene*, No. 04 CIV. 6132 (SAS), 2008 WL 216912, at *8-9 (S.D.N.Y. Jan. 22, 2008) ("In *Aparicio v. Artuz*, the Second Circuit held that an ineffective assistance of trial counsel claim, raised before a state court as an underlying issue in a coram nobis motion arguing ineffective assistance of appellate counsel, was actually exhausted. . . . The reasoning in *Aparicio* applies to the five of Davis' trial counsel claims that rest on facts within the trial record . . . [and those claims] are therefore exhausted by Davis' coram nobis motion. . . . [However, a]s in *Aparicio*, no good reason exists here [for the defendant's failure to raise the underlying issue on direct appeal]; in fact, once the Appellate Division denied the ineffective assistance of counsel claims neither it nor any other court could hear the trial counsel claims under section 440.10, because there was no justification for Davis' failure to raise those claims on direct appeal. Because the claims have been defaulted under a state procedural rule, federal habeas review is precluded[.]"); *see also, Cumberland v. Graham*, No. 08 CIV. 04389 LAP DF, 2014 WL 2465122, at *32 (S.D.N.Y. May 23, 2014) ("Although it is not entirely clear whether the trial-counsel claim in *Aparicio* had actually been raised on coram nobis as an independent claim (as opposed to as a predicate for a claim challenging the effectiveness of appellate counsel), most courts have read *Aparicio* to apply to underlying claims raised on coram nobis either directly or indirectly. Ultimately, though, it does not matter whether this court finds that Petitioner's ineffective-assistance-of-trial-counsel claim is exhausted, under

*Aparicio*, or unexhausted but "deemed" exhausted, as set out above, as, in either event, the claim would be procedurally barred from review by this Court.") (citation omitted).

Based on the foregoing discussion, the Court here finds that numbers 4) and 5) are unexhausted, but that even if they were exhausted, they are nevertheless procedurally barred. Similarly, the Court finds that numbers 2) and 3) are procedurally barred, in addition to being unexhausted, since Petitioner failed to raise them in his direct appeal and presumably would not be able to raise them now in a separate collateral attack in New York state court. *See, Aparicio v. Artuz*, 269 F.3d at 91 ("New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal. N.Y.Crim. Proc. Law § 440.10(2)(c)."). This is particularly true, with regard to numbers 4) and 5), where, as here, the state courts have already denied Petitioner's claim for ineffective assistance of appellate counsel. *See, Aparicio v. Artuz*, 269 F.3d at 91 ("The nagging question here is whether Petitioner's failure to assert ineffective assistance of trial counsel . . . might be forgiven under § 440.10 because of the ineffective assistance of Petitioner's appellate counsel. Given the Appellate Division's determination in the coram nobis proceeding that Petitioner "failed to establish that he was denied effective assistance of appellate counsel," *People v. Aparicio*, 696 N.Y.S.2d at 697, we are persuaded that it is most unlikely that another state court would suddenly find the performance of Petitioner's appellate counsel to be so ineffective as to justify Petitioner's failure to include this ineffective assistance of trial counsel claim in his direct appeal. Thus, any state court to which Petitioner might now present this claim would almost certainly find it procedurally barred.").

The Court having found that points 2), 3), 4) and 5) of Petitioner's ineffective-assistance claim are unexhausted and procedurally defaulted, those claims must be denied unless Petitioner can demonstrate either cause and prejudice or actual innocence: "That procedural

default can only be cured by a showing of cause for the default plus prejudice, or a showing of actual innocence." *Aparicio v. Artuz*, 269 F.3d at 91 (citation omitted); *see also*, *St. Helen v. Senkowski*, 374 F.3d at 184 ("In the case of procedural default (including where an unexhausted claim no longer can proceed in state court), we may reach the merits of the claim "only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (internal quotation marks and citations omitted).").

Petitioner, though, has not attempted to demonstrate cause, prejudice or actual innocence. Instead, the Petition incorrectly maintains that Petitioner exhausted all of his claims. Similarly, Petitioner's Traverse brief asserts that he exhausted all of his claims via his direct appeal and his coram nobis motion. Petitioner has not offered any alternative argument (regarding cause and prejudice or actual innocence) in the event that the Court were to disagree with his exhaustion argument, which it does.

To the extent that Petitioner's *pro se* submissions can be liberally construed to suggest that his failure to exhaust was caused by the ineffectiveness of his appellate counsel, to establish cause he would need to show that his appellate attorney's performance amounted to ineffective assistance of counsel in violation of the Sixth Amendment. *See*, *Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) ("A defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default only when the counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel." ). The applicable legal principles are clear:

> With respect to claims of ineffective assistance of appellate counsel, the Supreme Court has also held, as relevant here, that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal."

26

> *Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000)
> (describing *Barnes*, 463 U.S. 745, 103 S.Ct. 3308); *see also Lynch v. Dolce*, 789
> F.3d 303, 319 (2d Cir.2015).

*Chrysler v. Guiney*, 806 F.3d 104, 118 (2d Cir. 2015). "Counsel's failure to raise a claim on appeal constitutes "constitutionally inadequate performance" where "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Morales v. United States*, 651 F. App'x 1, 5 (2d Cir. 2016) (quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994), also *citing Jackson v. Leonardo*, 162 F.3d 81, 85 (2d Cir.1998)).

Here, though, none of the points raised by Petitioner involve "significant and obvious issues" that were "clearly and significantly" stronger than the issues raised by appellate counsel. Consequently, Petitioner cannot demonstrate cause, and the Court therefore need not consider prejudice, though the Court does not believe that he can demonstrate that element either. Moreover, even liberally construing Petitioner's *pro se* submissions, they do not make any gateway showing of actual innocence. See, *Hyman v. Brown*, 927 F.3d 639, 656–58 (2d Cir. 2019) (discussing the standards applicable to actual innocence claims). Consequently, the procedurally defaulted claims are denied.

To reiterate, with regard to Petitioner's "Ground Two," alleging five separate incidents of alleged ineffective assistance of counsel, the Court finds that only number 1) alleging that trial counsel was ineffective at the *Huntley* hearing, for "fail[ing] to raise  the bullying manner of interrogation and comments by detective Cedric Holloway," is exhausted.  The remaining instances are denied on the merits as procedurally defaulted.  The Court will now proceed to consider Petitioner's remaining claims on the merits.

The *Batson* Challenge

As discussed further below, the Petition asserts that "the trial court erroneously denied the defense's *Batson* objection" by failing to make the necessary findings at the third step of the *Batson* analysis.  As mentioned, the *Batson* issue arose after the prosecutor used a peremptory challenge to excuse Lannie, an African-American.  In response to the *Batson* challenge, the prosecutor indicated that he challenged Lannie for two reasons: First, because of Lannie's age and possible immaturity, inasmuch as he was age 23 year-old college student who lived with his parents and had a part-time job; and, second, because Lannie knew prosecution witness Exum, who was a friend of Lannie's sister.

In front of the trial court, Petitioner alleged that the prosecutor's reasons were pretextual, since Lannie had not indicated any hostility toward Exum, and since Lannie was close in age to a white juror, Wutz.  The prosecutor pointed out, though, that Wutz was two years older than Lannie and, unlike Lannie, was employed full time and lived independently of her parents.  Additionally, Wutz did not know any witnesses in the case.  The prosecutor also noted that he had challenged white prospective jurors similar in age to Lannie.

In the instant action, Petitioner also argues that Lannie was similarly situated to white juror Carol Schiferle, who was age 42 and employed full time, and who "knew in passing" prosecution witness, Dawn Lopez.  Schiferle, when asked to explain how she knew Lopez, indicated that she was aware of Lopez through friends of hers who were police officers, adding, "I know one of the officers, Dawn Lopez, not really personally. . . .  I don't really – I'm not friends with her.  I would say I just know her in passing." Transcript at p. 110.  The Court observes again, though, that the argument concerning Schiferle was never made to the trial court or, for that matter, to the Appellate Division.  Rather, as explained earlier, in the state courts, the argument concerning Schiferle was only raised in Petitioner's request for leave to appeal the denial of his direct appeal, in the context of a claim for ineffective assistance of trial counsel.

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme

Court, "[i]n recognition of the danger of race-based jury selection in a particular trial,"

> mandated a three-step burden-shifting framework for determining whether the
> prosecution exercised its peremptory challenges on the basis of race. Under this
> framework, a defendant must first establish a prima facie case of racial bias. *Id.* at
> 96–97, 106 S.Ct. 1712. If he or she succeeds in doing so, the prosecution must
> then offer a race-neutral explanation for its challenge to the jurors in question. *Id.*
> at 97, 106 S.Ct. 1712; *see also Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct.
> 1769, 131 L.Ed.2d 834 (1995). Even if the reasons the prosecution provides are
> neither "persuasive, [n]or even plausible," as long as those reasons are facially
> valid, the burden will then switch to the defendant to prove that the reasons the
> prosecution gave are a pretext for purposeful discrimination. *Id.* at 767–68, 115
> S.Ct. 1769.   At that point, the determination "largely will turn on [the court's]
> evaluation of credibility," *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712, and,
> therefore, "the best evidence often will be the demeanor of the attorney who
> exercises the challenge," *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct.
> 1859, 114 L.Ed.2d 395 (1991).

*Majid v. Portuondo*, 428 F.3d 112, 126 (2d Cir. 2005).

Here, Petitioner argues that "[t]he trial court fell short of adjudicating Petitioner's *Batson*

claim on the merits by accepting at face value [the] prosecutor's facially neutral explanation for

[the] strike, without a finding of credibility," citing *Dolphy v. Mantello*, 552 F.3d 236 (2d Cir.

2009).[25]   This Court considers carefully the merit of Petitioner's argument, given the relatively

terse explanation provided by the trial court for denying the *Batson* objection.  However, while

the trial court's explanation could have been more comprehensive, the Court disagrees with

Petitioner and finds that the trial court indicated that it found the prosecutor's explanation credible

and not a pretext for discrimination, thereby satisfying the requirements of *Dolphy v. Mantello.*

In this regard, the legal principle referenced by Petitioner was set forth by the Second

Circuit as follows:

---

[25] Traverse, ECF No. 8 at pp. 6-7.

"[T]he third step of the *Batson* inquiry requires a trial judge to make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir.2000) (internal quotation and citation omitted).

Trial courts applying the third *Batson* prong need not recite a particular formula of words, or mantra. *Galarza v. Keane*, 252 F.3d 630, 640 n. 10 (2d Cir.2001). An "unambiguous rejection of a *Batson* challenge will demonstrate with sufficient clarity that a trial court deems the movant to have failed to carry his burden to show that the prosecutor's proffered race-neutral explanation is pretextual." *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir.2006). However, we have repeatedly said that a trial court must somehow "make clear whether [it] credits the non-moving party's race-neutral explanation for striking the relevant panelist." *Messiah*, 435 F.3d at 198; *see Galarza*, 252 F.3d at 636 ("We have repeatedly emphasized that a trial court may not deny a *Batson* motion without determining whether it credits the race-neutral explanations for the challenged peremptory strikes."); *Jordan*, 206 F.3d at 200 ("Jordan now declares that the district court's conclusory statement that the prosecutor's explanations were race neutral did not satisfy Batson 's third step. We agree."); *Barnes v. Anderson*, 202 F.3d 150, 156 (2d Cir.1999) (holding that "denial of a *Batson* motion without explicit adjudication of the credibility of the non-movant's race-neutral explanations for challenged strikes" constitutes error).

*Dolphy v. Mantello*, 552 F.3d at 239.

Here, as discussed earlier, after hearing argument back and forth between the attorneys on the *Batson* challenge, the trial court stated:

I do have to find that, based on the District Attorney's explanations, that there are many race-neutral explanations for the challenge, and particularly knowing a witness per se pretty much would explain, no matter what the race of the prospective juror.  In most cases, I'm sure you would agree, Mr. Terranova, that that is a reason, as in the Stuart Easter example, so the *Batson* challenge is denied.

(Transcript at p. 195).  In this regard, the trial court indicated not only that the prosecutor had offered a race neutral reason for the challenge to Lannie, but that "based on the District Attorney's explanations," the reason was not a pretext for discrimination.  Indeed, the trial court indicated that "knowing a witness" was not only a legitimate race-neutral reason for excusing

Lannie,  but that the prosecutor had, for the same reason, also dismissed white prospective

jurors in the case, such as the prospective juror who knew prosecution witness Officer Stuart

Easter.[26]  Consequently, the Court finds that the trial court made the necessary finding at step

three of the *Batson* inquiry, as required by *Dolphy v. Mantello*, and that Petitioner's argument to

the contrary therefore lacks merit. *See, e.g., Bowman v. Lee*, No. 10-CV-0951 ERK, 2015 WL

1514378, at *11 (E.D.N.Y. Apr. 3, 2015) ("Although the trial judge did not expressly credit the

prosecutor's explanation for striking Ms. Thomas in particular, courts need not engage in "a

talismanic recitation of specific words in order to satisfy *Batson*." *Messiah*, 435 F.3d at 198.  In

addition to the trial judge's clear statement finding a lack of subterfuge generally, the judge's

explanation that the prosecutor had a right to be concerned about Ms. Thomas's potential

empathy for the defendant implicitly credits the prosecutor's good faith in explaining his race-

neutral reasoning. The prosecutor's good faith is further bolstered by his decision to strike Mr.

Derek, a prospective juror who had participated in multiple volunteer projects involving prison

inmates."), *aff'd*, 641 F. App'x 51 (2d Cir. 2016).

<u>Ineffective Assistance of Counsel</u>

The Petition alleges that trial counsel was ineffective during the *Huntley* hearing when he

"failed to raise the bullying manner of interrogation and comments by detective Cedric Holloway."

Although Petitioner does not flesh out this argument, he apparently maintains that if his attorney

had "raised the bullying manner of interrogation and comments" about Petitioner's silence by

Holloway, the trial court would have found that his statements were involuntarily made and

---

[26] The fact that potential white juror Schiferle also indicated that she knew a police witness, though only "in passing" and "not really personally," Transcript at pp. 109-110, seems of no consequence to the Court, since that point was never raised to the trial judge.  In any event, the Court does not agree with Petitioner that Lannie and Schiferle were similarly situated, except for their races, in terms of the circumstances under which they "knew" the police witnesses.  Lannie indicated that he knew Officer Exum, while Schiferle essentially indicated that she "knew of" Officer Lopez.

suppressed them.   Respondent counters that Petitioner cannot make the showing required to establish ineffective assistance, stating:

> Petitioner cannot make that showing here. He said very little in his statement to the police, and the little that he did say was an outright denial. In light of the fact that petitioner's "will was not overborne," his statement was voluntary. *Mickey v Ayers*, 606 F3d 1223, 1234 (9th Cir 2010) (O'Scannlain, J.), cert denied 565 US 952. Counsel provided excellent representation throughout the proceedings; he lodged proper objections, cross-examined the People's witnesses, made a motion for a trial order of dismissal, and successfully moved to dismiss the top count of the indictment. Counsel cannot be held ineffective for failing to make an argument that was doomed to fail.

ECF No. 6 at pp. 13-14.

The familiar test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for evaluating an ineffective assistance of counsel claim has two prongs. The first requires showing that counsel's performance "fell below an objective standard of reasonableness." *Id*. at 688, 694. "Constitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). Fulfilling the second prong of an ineffective assistance claim requires a showing of prejudice which translates to "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The habeas petitioner bears the burden of establishing both deficient performance and prejudice." *Greiner*, 417 F.3d at 319 (citing *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004)).

A defense attorney cannot be deemed ineffective for failing to pursue an unmeritorious defense or application. *See, United States v. Kirsh*, 54 F.3d 1062, 1071 (2d

Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance, *see United States v. Javino*, 960 F.2d 1137, 1145 (2d Cir.), cert. denied, 506 U.S. 979, 113 S.Ct. 477, 121 L.Ed.2d 383 (1992), and "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992), cert. denied, 507 U.S. 998, 113 S.Ct. 1619, 123 L.Ed.2d 178 (1993); *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir.1990).").

Preliminarily, the Court observes that in his pretrial omnibus motion defense counsel moved to suppress Petitioner's statements as having been "involuntarily made." The trial court granted a *Huntley* hearing and, in connection with that hearing, received in evidence a CD recording of Petitioner's thirteen-minute interview, as well as testimony from Joy Jermain ("Jermain"), a detective who, along with Holloway, interviewed Petitioner after Petitioner waived his *Miranda* rights and agreed to speak to the detectives. The primary strategy of Petitioner's attorney, at the *Huntley* hearing, was to establish that Petitioner's statement was involuntarily made since Petitioner had been intoxicated at the time he was administered his *Miranda* warnings.  The trial court denied Petitioner's motion, finding in pertinent part that Petitioner "was not impaired by alcohol at the time he was made aware of his *Miranda* rights, and that he voluntarily and knowingly waived the *Miranda* warnings."

Against this backdrop, Petitioner now maintains that counsel was ineffective because he failed to also argue that Holloway acted in a bullying manner and made statements that were improper insofar as they were designed to goad Petitioner into admitting his involvement in the crimes.  Petitioner, though, offers no legal citation or

analysis indicating that such an argument would have been successful.  Nor does the Court believe that it would have been successful.  In that regard, Petitioner has not argued or shown, nor does the record indicate, that the totality of the circumstances surrounding the interview rendered Petitioner's post-*Miranda* statements involuntary, or that Holloway's conduct was so fundamentally unfair that it denied Petitioner due process or raised the danger that it would induce a false confession. *See, People v. Green*, 73 A.D.3d 805, 805, 900 N.Y.S.2d 397, 398 (2d Dept. 2010) ("Contrary to the defendant's contention, based on the totality of the circumstances (*see People v. Anderson*, 42 N.Y.2d 35, 35–39, 396 N.Y.S.2d 625, 364 N.E.2d 1318), including the duration and conditions of his detention, the conduct and demeanor of the police toward him, and his age, physical state, and mental state (*see People v. Martin*, 68 A.D.3d 1015, 890 N.Y.S.2d 646; *People v. Pegues*, 59 A.D.3d 570, 571–572, 873 N.Y.S.2d 160; *People v. Petronio*, 34 A.D.3d 602, 604, 825 N.Y.S.2d 99), the defendant's post-*Miranda* (*see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694) statements were voluntarily given. Moreover, the deception employed here by law enforcement officers was neither "so fundamentally unfair as to deny due process," nor did it raise the danger that it would induce a false confession. (*People v. Tarsia*, 50 N.Y.2d 1, 11, 427 N.Y.S.2d 944, 405 N.E.2d 188; *see People v. Sanabria*, 52 A.D.3d 743, 745, 861 N.Y.S.2d 359; *People v. Ingram*, 208 A.D.2d 561, 616 N.Y.S.2d 780; *People v. James*, 146 A.D.2d 712, 536 N.Y.S.2d 858)."); *see also, People v. Niemann*, 21 Misc. 3d 136(A), 873 N.Y.S.2d 514 (App. Term 2008) ("[E]ven if the Troopers informed defendant that his companion was subject to arrest, in part to induce him to admit his alcohol consumption and his involvement in the accident, the strategy was not "so fundamentally unfair as to deny due process or likely to induce

a false confession" (*People v. Velez*, 211 A.D.2d 524 [1995]; see also *People v. Cannady*, 243 A.D.2d 642 [1997] ).").

Nor has Petitioner claimed that he suffered any particular prejudice as a result of his attorney's failure to advance this argument at the *Huntley* hearing.  As Respondent points out, although Petitioner waived his *Miranda* rights and agreed to speak with the detectives, "[h]e said very little in his statement to the police, and the little that he did say was an outright denial."  Petitioner's Traverse fails to counter this argument.  At most, the Traverse baldly asserts that trial counsel committed a number of errors (referring to the five instances of alleged ineffectiveness of trial counsel described in the Petition, four of which the Court has already denied as procedurally barred), the cumulative effect of which "compromised" his right to effective assistance of counsel.[27]  Petitioner is correct that under the *Strickland* test, "[i]n assessing prejudice, we consider the cumulative effect of the errors committed by counsel." *Gross v. Graham*, 802 F. App'x 16, 18 (2d Cir. 2020). However, for the reasons already discussed, Petitioner has not shown that trial counsel committed any errors of constitutional significance, and therefore he cannot demonstrate that the cumulative effect of his attorney's errors resulted in prejudice.

In sum, the Court finds that Petitioner has not made the necessary showing under either prong of the *Strickland* test, and his claim that trial counsel was ineffective is therefore denied as lacking merit.

<u>Denial of Right to Remain Silent</u>

Petitioner further contends that the trial court violated his right to remain silent, by admitting the tape recording of the thirteen-minute interrogation into evidence.  Petitioner

---

[27] ECF No. 8 at p.

maintains that the jury should not have been permitted to hear Detective Holloway's questions, since his "ridiculing and mocking of Petitioner's silence to cajole Petitioner to break that silence and answer his questions [shifted] the burden to Petitioner to explain himself."[28]   Liberally construing Petitioner's submissions to raise the strongest arguments that they suggest, the Court understands Petitioner to be raising a due process claim under *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), in which

> the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. 2240. The Court reasoned that "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *See id.* at 618, 96 S.Ct. 2240.

*Grigg v. Phillips*, 401 F. App'x 590, 591 (2d Cir. 2010).  Here, while Petitioner did not testify and was not impeached with his silence, he nevertheless maintains that the playing of the recorded interview, in which he remained silent after making his initial statement, despite Holloway's efforts to get him to explain himself, had the effect of penalizing him for remaining silent.

The Court disagrees, since Petitioner did not in fact exercise his right to remain silent, but rather, he chose to make a post-*Miranda* statement, and then never reasserted his right to remain silent.   In *U.S. v. Pitre*, 960 F.2d 1112 (2d Cir. 1992), the Second Circuit held:

> Otero argues that Agent McDonnell's testimony regarding the post-arrest interview and the government's remarks in rebuttal pertaining to this testimony were improper because his conduct in declining to respond to Agent McDonnell's question, regarding who gave him the bag, was an exercise of his fifth amendment right to remain silent. We find Otero's claim to be without merit.

---

[28] Petition, ECF No. 1 at p. 21.

It is undisputed that Otero was read his *Miranda* rights. *See Doyle v. Ohio*, 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976) (footnote omitted) ("[W]hile it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."). Herein, despite the *Miranda* warnings, Otero made statements to Agent McDonnell during the post-arrest interview, thus, waiving his right to remain silent under *Miranda. See Moran v. Burbine*, 475 U.S. 412, 420–23, 106 S.Ct. 1135, 1140, 1141–42, 89 L.Ed.2d 410 (1986). Therefore, unless Otero resurrected and asserted his right to remain silent, the government was entitled to introduce this evidence at trial and comment on it during summation. Persuaded by the view of the First Circuit in *United States v. Goldman,* 563 F.2d 501, 502–04 (1st Cir.1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978), we believe that Otero waived his right to remain silent and did not thereafter assert this right. In *Goldman*, the defendant, upon being arrested and read his *Miranda* rights, was given a standard waiver of rights form. The defendant signed this form and answered questions asked of him by the investigating agent. However, the defendant "either refused to respond or did not respond" to two of the agent's questions. During trial, the government introduced testimony concerning the defendant's conduct with regard to the two questions and commented upon it in summation. Following his conviction, the defendant appealed, claiming the testimony concerning the two questions asked by the agent and the government's remarks relating to the questions violated his right to remain silent. In analyzing his claim, the First Circuit found no indication in the record that the defendant wished to assert his right to remain silent, and the court commented that, based on the record, it appeared the defendant wished to give an exculpatory story. Stating that the defendant's decision not to answer a question "was simply a strategic choice, perhaps based on a fear that any answer might weaken [his] story," and that "the failure to answer was not a reassertion of rights," *id.* at 504 n. 5, the First Circuit rejected the defendant's claim. Likewise, herein, since Otero clearly waived his right to remain silent and there is no indication in the record that he resurrected and asserted this right, we find his claim to be without merit.

960 F.2d at 1125–26; *see also, Nowicki v. Cunningham*, No. 09 CIV. 8476 KMK GAY, 2011 WL 12522139, at *5 (S.D.N.Y. Mar. 30, 2011) ("*Doyle* does not protect a defendant's post-*Miranda* waiver silence. Therefore, the threshold question in any *Doyle* claim is whether the petitioner waived and subsequently failed to reassert their right to remain silent. In two of the challenged

colloquies, the prosecutor questioned the detectives about interviews with Nowicki that occurred after he had waived his *Miranda* rights.   Since petitioner waived and never reasserted his *Miranda* rights, the prosecution did not contravene *Doyle* by inquiring into Nowicki's failure to offer exculpatory statements during his interviews with the detectives.") (citations omitted); *Hogan v. Ercole*, No. 05-CV-5860 RRM, 2011 WL 3882822, at *10 (E.D.N.Y. Sept. 2, 2011) ("The use of a defendant's post-arrest silence may violate due process and the privilege against self-incrimination. *Brecht v. Abrahamson*, 507 U.S. 619, 629–30, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *Doyle v. Ohio*, 426 U.S. 610, 617–18, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Grigg v. Phillips*, 401 F. App'x 590, 593 (2d Cir.2010).   However, once an arrestee waives his right to remain silent, the government is entitled to introduce evidence at trial of the arrestee's silence in response to questions, and the government may comment on that silence during summation, as long as the arrestee did not resurrect and assert his right to remain silent. *See United States v. Pitre*, 960 F.2d 1112, 1125 (2d Cir.1992) ("[U]nless [petitioner] resurrected and asserted his right to remain silent, the government was entitled to introduce this evidence at trial and comment on it during summation.").   At trial, Detective Severin testified that that petitioner was silent when asked why he had not turned himself in to the Albany police and when asked why he told his family that he was going to Virginia and went to Tennessee instead. However, prior to trial, the court determined that petitioner was properly read his *Miranda* rights by the Nassau County Police Department and that he waived his right to remain silent, thus finding admissible his post-arrest statements to Detective Severin. As such, that defendant declined to answer some questions is not constitutionally protected.") (citations to trial record omitted).

Even assuming *arguendo* that a *Doyle* violation occurred here, which the Court does not find, it would be harmless in light of the relevant factors:

The Supreme Court has addressed directly the proper standard of review in determining whether the occurrence of a *Doyle* error during a state court trial constitutes harmless error. In *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Court adopted a harmless error standard for violations of this type drawn from the Court's decision in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), asking "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239). Assessing harmless error outside the context of *Doyle* violations, we have identified four factors as particularly relevant to the analysis: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir.2004). Of the four factors, "[t]he strength of the prosecution's case is probably the single most critical factor." *United States v. Reifler*, 446 F.3d 65, 87 (2d Cir.2006) (alteration in original) (quoting *Latine v. Mann*, 25 F.3d 1162, 1167–68 (2d Cir.1994)).

*Grigg v. Phillips*, 401 F. App'x 590, 593 (2d Cir. 2010) (footnote omitted).

Considering the foregoing factors, any error here would be harmless.  In that regard, the Court particularly notes that the evidence against Petitioner as to the crimes for which he was convicted was strong, if not overwhelming, and that the prosecutor did not emphasize Petitioner's silence during the interview or attempt to use it as evidence of his guilt.  Rather, as already discussed, in response to defense counsel's closing argument that the interview had been "illegal," the prosecutor disputed that characterization and argued that the recording of the interview was important not because of Petitioner's silence, but because Petitioner's statement (that he had been sleeping immediately prior to his arrest), made after waiving his *Miranda* rights, was inconsistent with the rest of the evidence.

For these reasons Petitioner's claim that he was denied due process, when his right to remain silent was violated, lacks merit and is denied.

CONCLUSION

The application under 28 U.S.C. § 2254 is denied.  The Clerk of the Court is directed to close this case.  Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right.  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962).  Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

Dated:Rochester, New York
      November 18, 2020

ENTER:


/s/ Charles J. Siragusa
          CHARLES J. SIRAGUSA
United States District Judge